IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

DALLAS DIVISION

CLEBURNE LIVING CENTER, INC., )
ET AL. )
    )
VS. )       NO. CA3-80-1576-F
    )
CITY OF CLEBURNE, TEXAS, ET )
AL. )

U. S. DISTRICT COURT
NORTHERN DISTRICT OF TEXAS

**FILED**

OCT 4 1982

JOSEPH McELROY, JR., CLERK
BY_____
                    Deputy

## MEMORANDUM OPINION

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

I.  FINDINGS OF FACT

1.  Plaintiff Cleburne Living Center, Inc. (hereinafter referred to as "CLC") is a three shareholder Texas corporation organized for the purpose of establishing and operating supervised group homes for persons who are mentally retarded. The corporation is not a non-profit organization.  It has leased a house at 201 Featherston Street in the City of Cleburne, Texas from Jan Hannah for the purpose of establishing a group home for thirteen mentally retarded adults at that address.  On or about February 4, 1982, CLC changed its corporate name to Community Living Concepts, Inc., but the name change left unaffected all other aspects of CLC.

2.  Plaintiff Jan Hannah is CLC's Vice President and holds one third of the corporation's outstanding stock.  She is the owner of the house at 201 Featherston Street in the City of Cleburne, having purchased it in July, 1980, for the purpose of leasing it to CLC for the operation of a group

home for persons who are mentally retarded.

3. Plaintiff Johnson County Association for Retarded Citizens (hereinafter Johnson County ARC) is a non-profit Texas corporation established for the purpose of advocating and representing the interests of the mentally retarded residents of Johnson County.  It has approximately two hundred (200) members, among whom are parents of mentally retarded children and adults, mentally retarded persons (at least one of whom, Sylvia Sims, is a potential resident of the home), special education teachers and educational diagnosticians employed by the Cleburne Independent School District, and other concerned Johnson County residents.  As an organization, it supports the establishment of group homes, including the Featherston Street one, for persons who are mentally retarded.

4. Plaintiff Advocacy, Inc., is a non-profit Texas corporation formed to insure and protect the legal rights of persons who are dvevelopmentally disabled, including those who are mentally retarded persons.  It is a statewide legal advocacy system affiliated with the State Bar of Texas and established pursuant to 42 U.S.C. § 6012.  Among the rights for which Advocacy, Inc. advocates is the right of mentally retarded persons to live in group homes in community settings.

5. Defendant City of Cleburne is a municipal corporation established pursuant to the laws of the State of Texas.  As a Texas municipal corporation, the city has certain powers and duties, among which are certain zoning powers.

6.  Defendant George W. Marti is the Mayor of the City of Cleburne.  In conjunction with his duties as mayor, he is the chairman of the City of Cleburne City Council and a voting member of that council in case of ties.

7.  Defendants J. T. Bass, Arval Martin, Jr., and Alfred Johns are elected, voting members of the City of Cleburne City Council which is empowered under Texas law to enact municipal zoning ordinances and which is responsible for granting or denying special use permits under the City of Cleburne zoning ordinance.

8.  Defendant Robert Miller is the City Attorney for the City of Cleburne, responsible for the prosecution of violations of the City of Cleburne zoning ordinance.

9.  In July, 1980, Jan Hannah purchased the lot and house located at 201 Featherston Street in Cleburne, Texas (hereinafter sometimes referred to as the Featherston Street home).  This property is officially described in Cleburne city records as the north two thirds of lot 1, block 498, of the City of Cleburne.

10.  At the time of purchase by Jan Hannah, the Featherston Street home was in a district classified under Cleburne's zoning ordinance as an apartment house district.  The use district also is called an R-3 zone.  That zoning classification is still the same for the home at the time of trial.

11.  On June 8, 1965, the City Council of the City of Cleburne enacted a zoning ordinance for the city which included for the first time in the city zoning ordinance the

3

texts of §§ 8(6) and 16(9) of the current ordinance as they now read.

None of the current city council members of the City of Cleburne were members of the city council on June 8, 1965.

12.  Under Section 8 of Cleburne's zoning ordinance, the following uses are all permitted uses in a district zoned R-3, including the district in which the Featherston Street home is situated:

(1)  Any use permitted in District R-2.

(2)  Apartment houses, or multiple dwellings.

(3)  Boarding and lodging houses.

(4)  Fraternity or sorority houses and dormitories.

(5)  Apartment hotels.

(6)  Hospitals, sanitariums. nursing homes or homes for convalescents or aged, other than for the insane or feeble-minded or alcoholics or drug addicts.

(7)  Private clubs or fraternal orders, except those chief acitvity is carried on as business.

(8)  Philanthropic or eleemosynary institutions, other than penal institutions.

(9)  Accessory uses customarily incident to any of the above uses, and located on the same lot, not involving the conduct of a business or industry.

   a.  There shall be permitted such facilities as are customarily accessory to the operation of an apartment hotel when conducted and entered from within the building.

   b.  Private or storage garages, located as provided in District R-1 for private garages, may provide space for not more than one motor vehicle for each seven hundred and fifty (750) square feet of lot area.  No business occupation or services connected with motor vehicles, except washing occupant autos shall be permitted.

4

(10)  Signs as provided in Section 21.

13.  Under Section 16, subdivision 9, of Cleburne's zoning ordinance, "[h]ospitals for the insane or feeble minded, or alcoholic or drug addicts, or penal or correctional institutions" are listed as uses requiring the issuance of a special use permit by the Cleburne city council before such use of property in the city may be made.

14.  Under Cleburne's zoning ordinance, each special use permit issued is good for only one year.

15.  On July 28, 1980, after being told by the responsible city officials of the necessity for doing so if they wished to operate the Featherston Street home as proposed, Jan Hannah and Bobbie Northrop paid the city $40 to apply for a special use permit.  The permit was sought to operate the Featherston Street home as a "Residential Care facility for Mentally Retarded Adults".

16.  On August 18, 1980, the city's Planning and Zoning Commission held a hearing and voted to deny the special use permit for the Featherston Street home.

17.  Although it originally had planned to start operation of the Featherston Street home around October 1, 1980, CLC, in the face of the zoning problems with the city, postponed the planned operational date to November 1, 1980.

18.  On September 29, 1980, the City of Cleburne, through its then Assistant City Attorney, Robert T. Miller, Jr., sent a letter to Bobbie Northrop stating that a special use permit was required to operate the Featherston Street home and classifying the proposed use as a hospital for the

5

feeble-minded.  Bobbie Northrop received this letter shortly
after it was sent.

19.  On October 14, 1980, the City Council of Cleburne
held a public hearing on the special use permit application
for the Featherston Street home and, in a three to one vote,
voted to deny the permit application.

20.  The Featherston Street home will house thirteen
mentally retarded adults and will be operated by CLC as  a
Level I Intermediate Care Facility for the Mentally Retarded
(hereinafter sometimes referred to as an ICF-MR) under
extensive regulations and guidelines established and administered
by the United States Department of Health and Human Services,
the Texas Department of Human Resources, the Texas Department
of Mental Health and Mental Retardation, and the Texas
Department of Health.  CLC plans to comply with all applicable
and valid statutes, regulations, codes, and ordinances.

21.  The structure at 201 Featherston Street is a
large, one story frame house containing a living room, an
alcove, a dining room, a breakfast room, a kitchen, an
attic, a laundry room, four bedrooms, a den, and two baths,
with a half bath to be added.  It is on a corner lot, and
there are front, side, and back yards, as well as a large
front porch.  Across the street to the north of the Featherston
home is a public junior high school which numbers among its students
about thirty mentally retarded children between the ages of nine
and twenty one years.  Directly behind the Featherston home to
the south is a two story apartment house.  A dentist's office is

on the corner northeast of the Featherston home.

22.   The people who will live in the Featherston Street home will be men and women eighteen years of age or older who are mildly or moderately mentally retarded. They will be completely ambulatory.

23.   The Featherston Street home will have twenty four hour supervision, divided basically into eight hour shifts. Besides handling administrative matters, some cooking, and some cleaning chores, the staff will work with the mentally retarded residents to train and teach them in such areas as kitchen management, maintenance, personal budgeting, meat preparation, academics related to independent living (such as how to read classified advertisements for jobs and housing), and the use and enjoyment of leisure time activities. The program for each resident will be flexible, depending on his or her needs, and will be based on an individual program plan prepared for each resident of the group home by an interdisciplinary team. Although a registered nurse will visit the home once a month, there will be no licensed nursing or medical staff in the home or employed by CLC. The residents will have jobs in the community and in a work activity center. They probably will not have private automobiles. Their stay at the Featherston Street home will be voluntary, and its length will be indeterminate.

24.   If the potential residents of the Featherston Street home were not mentally retarded, but the home was the same in all other respects, its use would be permitted under the city's zoning ordinance.

25.   Beginning in fiscal year 1980 (which started on October 1, 1979) and continuing in each of the next two fiscal years, the City of Cleburne has been a recipient of federal financial assistance, including financial assistance under the State and

Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C. § 1221
et seq. (hereinafter referred to as the Revenue Sharing Act).  The
city received revenue sharing funds equalling $203,361 in fiscal year
1980, $203,433 in fiscal year 1981, and at least $51,357 thus far
in fiscal year 1982.

26.  The city's city council is the principal allocator
of revenue sharing funds within the city, and it is responsible
to the federal Office of Revenue Sharing for the accounting
of the receipt and use of revenue sharing funds.

27.  Revenue sharing funds have been spent in the
following ways, among others:  (a)  road construction;  (b)
the purchase of capital equipment for the city's department
of public works; (c) the purchase of capital equipment for
City Hall; (d) water utility systems; (e) parks and recreation;
(f) debt service; and (g) library materials.

28.  A civil rights complaint against the City of
Cleburne, alleging that the zoning ordinance and the denial
of the special use permit that are at issue in this case
violate the Revenue Sharing Act antidiscrimination provisions,
was filed with the federal Office of Revenue Sharing by
Cleburne Living Center, Inc., on its own behalf and on
behalf of the mentally retarded potential residents of the
Featherston Street home.  The Office of Revenue Sharing
received the complaint on September 29, 1981, and, as of
March 22, 1982, a determination had not been made or issued
by that federal office with respect to the complaint.

8

29.  The city council's vote on October 14, 1980, as well as the city Planning and Zoning Commission's earlier vote on August 18, 1980, to deny a special use permit for the Featherston Street group home was motivated primarily by the fact that the residents of the home would be persons who are mentally retarded.

30.  Group homes currently are the principal community living alternatives for persons who are mentally retarded. The availability of such a home in communities is an essential ingredient of normal living patterns for persons who are mentally retarded, and each factor that makes such group homes harder to establish operates to exclude persons who are mentally retarded from the community.

31.  No group homes or hospitals for persons who are mentally retarded are in Cleburne. One is, however, located in Keene, Texas. Keene is also in Johnson County and is approximately 15 minutes by automobile from Cleburne.

32.  Persons who are mentally retarded historically have been subjected to exclusion from the political process and have been isolated in remote, stigmatizing living arrangements.

33.  None of the named Plaintiffs themselves are developmentally disabled.

34.  Members of the City Council of Cleburne considered the following factors in their decision to deny Plaintiffs a special use permit for the house at 201 Featherston Street:

> a.  the attitude of a majority of owners of property located within two hundred (200) feet of 210 Featherston;

9

b.  the location of a junior high school across the street from 201 Featherston;

c.  concern for the fears of elderly residents of the neighborhood;

d.  the size of the home and the number of people to be housed;

e.  concern over the legal responsibility of CLC for any actions which the mentally retarded residents might take;

f.  the home's location on a five hundred (500) year    flood plain; and

g.  in general, the presentation made before the City Council.

35.  Plaintiffs were given a full and fair opportunity to voice their views to the City Council concerning their application for a special use permit.

36.  In their operation of the group home, Hannah and CLC planned to obtain fees from the residents, and in the event that the residents were unable to pay, subsidies from Medicaid.  A Level I Intermediate Care Facility program in Texas is a Medicaid funded program.

37.  ICF-MRs are required by the State of Texas to meet certain certification requirements set forth in Plaintiffs' Exhibit 25.  CLC preliminarily sought certification of its proposed facility.  On or about July 21, 1980 the Texas Department  of Health indicated to Mr. David Southern, a one-third shareholder in CLC, that the house at 201 Featherston would be an "adequate" ICF-MR Level I facility provided that certain repairs and modifications were made to the house. Because of the onset of this litigation, however, the requirements for certification were not completed and the Texas Department of Health has stated its intention to toll the one-hundred

and twenty day period for the completion of the requirements
pending the outcome of the litigation.

38.  Subsequent to CLC's applicaton for certification
of the ICF-MR in Cleburne, the Texas Department of Human
Resources issued new regulations with reference to ICF-MRs.
The new regulations (see Defendant's Exhibit 10) state that
certification as an ICF-MR will be limited to "six beds
per facility."  David Southern claims that state officials
have agreed that the new regulation does not apply to the
Cleburne facility retroactively.

39.  Currently, the house at 201 Featherston will
require approximately $8500.00 in repairs and modifications
in order to meet certification requirements that have gone
into effect since October of 1981.

40.  The lease of 201 Featherston from Jan Hannah to
CLC requires that the premises be used for "a residential
training facility for the adult mentally retarded" and no
other purpose.  Because of the denial of the special use
permit, in January of 1981 Hannah and CLC agreed to modify
the terms of the lease.  CLC continues to pay Hannah $600
per month for the future right to utilize the lease as
originally planned.  The original lease called for the
payment of $1300.00 per month.

41.  There is no evidence that any of the federal funds
received by the City of Cleburne pursuant to the Revenue
Sharing Act are used to exercise the city's zoning powers.
Further, the evidence is clear and convincing that, of the

federal funds received by the city, none are used to exercise
the city's zoning powers.

42. At all times material to the actions described
above, each named individual Defendant was serving in his
official capacity as an employee of the City of Cleburne,
Texas. Further, at all times material to the actions described
above, each named individual acted at all times in the due
performance of his official duties and, in good faith,
believed that he was carrying out those duties in a proper
manner.

II. CONCLUSIONS OF LAW

    A. Introduction

    Plaintiffs predicate this action upon the State and
Local Fiscal Assistance Act of 1972, as amended, 31 U.S.C. §
1221 et seq., (hereinafter Federal Revenue Sharing Act) and
the Fourteenth Amendment to the United States Constitution.
In particular, Plaintiff CLC claims that Defendants have
violated the nondiscrimination provision of the Federal
Revenue Sharing Act, 31 U.S.C. §1242(a)(1),[1] which incorporates
the prohibitions found in the Rehabilitation Act, 29 U.S.C.
§ 794, pertaining to "otherwise qualified handicapped individual[s]."[2]
The Defendant City challenges CLC's standing to bring the
claim and further asserts § 1242(a)(2)(A) of the Revenue
Sharing Act[3] as a defense. All Plaintiffs assert Fourteenth
Amendment challenges to the city's zoning ordinance, as
written and as applied. In particular, Plaintiffs claim the
acts of the Defendants amount to a denial of equal protection,
a denial of procedural and substantative due process, and an
infringement of Plaintiffs' constitutional rights to travel

12

and freedom of association.  Defendants challenge the standing,
both constitutional and prudential, of these litigants to
assert the claims in question.  In the alternative, Defendants
assert that the ordinance as written and in operation suffers
from no constitutional infirmities.

    B.   The Revenue Sharing Act and Rehabilitation Act Claim

    1.  CLC's standing.  CLC raises this claim in its own
right and in behalf of the group home's potential residents.
The Revenue Sharing Act provision conferring standing for
private civil actions states in pertinent part

> "Whenever . . . a unit of local government . . .
> has engaged or is engaging in any act or practice
> prohibited by this chapter [e.g., 31 U.S.C. § 1242
> (a)(1)] . . . a civil action may be instituted by
> the person aggrieved . . . ."

31 U.S.C. § 1244(a). (emphasis added)   It is undisputed
that CLC has properly exhausted its administrative remedies
prior to the institution of this action.  Congress, of
course, may not abrogate the basic Article III standing
requirements by statute.  Gladstone Realtors v. Village of
Bellwood, 441 U.S. 91, 60 L.Ed.2d 66 (1979).  Yet, it is
apparent that CLC has shown injury in fact which can be
redressed if the requested relief is granted.  Further, the
Court is ever mindful of the remedial purposes of the Act,
and is hesitant to give the Act a narrow reading in light of
its purposes.  It is also without doubt that the interests
asserted by CLC in this action fall within the "zone of
interests" sought to be protected by the statute.  See Ass'n
of Data Processing Service Organizations, Inc. v. Camp, 397

U.S. 150, 25 L.Ed.2d 184 (1970).  The Court finds further
support in recent Supreme Court cases addressing the issue
of statutory standing under the Fair Housing Act, 42 U.S.C.
§ 3601 et seq..Havens Realty Corp. v. Coleman, ___U.S. ____,
71 L.Ed. 2d 214 (1982); Gladstone Realtors, supra; Trafficante
v. Metropolitan Life Ins. Co., 409 U.S. 205, 34 L.Ed.2d 415
(1972).  Defendants contend, however, that none of the Plaintiffs
are "otherwise qualified handicapped individual[s]" and that
therefore they cannot be "persons aggrieved" wihin the
meaning of the Act.  The Court does not read this limitation
into the Revenue Sharing Act.  Instead, the Court concludes
that the term "person aggrieved" indicates a willingness on
the part of Congress to extend standing under the Act to all
entities which can satisfy traditional Article III requirements.
For the reasons set forth below,  the Court concludes that
CLC satisfies those requirements, including the prudential
requirements for jus tertii standing in behalf of mentally
retarded adults who are potential residents, or "clients" of
the group home.  In sum, CLC has standing to bring this
action in its own right and on behalf of potential residents
of the group home.

   2.  Section 1242(a)(2)(A).  Defendants contend that
they have demonstrated by clear and convincing evidence that
the city's zoning activities are not funded in whole or in
part by federal funds provided pursuant to the Revenue
Sharing Act.  There can be little doubt from the literal
language of the Act that its prohibitions are "program

14

specific."  Cf. North Haven Board of Education v. Bell,
___ U.S. ____, 50 U.S.L.W. 4501 (1982); Dougherty County
School System v. Harris,  622 F.2d 735 (5th Cir. 1980).  It
is undisputed that the burden of the section 1242(a)(2)(A)
defense falls upon Defendants.  Defendants rely exclusively
upon Plaintiffs' Exhibit Five (5), a breakdown of the city's
expenditures of Revenue Sharing Act funds for the years
1979-1981.  The exhibit shows that the city has spent the
funds in question upon roads, police, parks and recreation,
water and debt service.  Apparently not all of the funds
have been expended as there is a net positive balance.  It
is, of course, true that the city council has been the
official recipient and "trustee" of the funds. (But this
fact, without more, fails to rebut the force of Plaintiff's
Exhibit Five.  To conclude that the prohibitions against
discrimination incorporated into the Revenue Sharing Act
from the Rehabilitation Act are applicable to the mere
exercise of the city's zoning powers, without any further
proof of a nexus between the exercise of those powers and
the disbursement of Revenue Sharing Act funds, would eviscerate
the "program specific" nature of the Act.  In sum, Plaintiffs
attempt to place a square peg in  a round hole.  The Defendants
have shown by clear and convincing evidence that the zoning
decisions in question were not funded in whole or in part
with Revenue Sharing Act funds.  Hence these claims will be
dismissed on the merits.

    C.  THE CONSTITUTIONAL CLAIMS

    1.  Standing.  There are four named Plaintiffs in this

action who assert standing to litigate the constitutional
claims: CLC; Jan Hannah; Johnson County Association for
Retarded Citizens; and Advocacy, Inc. Only Hannah and CLC
claim a right to money damages. All Plaintiffs seek jus tertii
standing on behalf of adult mentally retarded citizens who
are potential residents at the group home.

CLC and Jan Hannah have clearly shown that they have
standing in their own right to assert the constitutional
claims. Each has suffered injury in fact as a direct result
of Defendants' conduct. Each has a personal stake in the
outcome sufficient to assure the "concrete adverseness"
required by Article III. Finally, the requested injunctive
relief would ameliorate the particular alleged injury. For
these reasons then, see e.g. Village of Arlington Heights v.
Metropolitan Housing Development Corporation, 429 U.S. 252,
50 L.Ed 2d 450 (1977), Warth v. Seldin, 422 U.S. 490, 45
L.Ed.2d 343 (1975), Baker v. Carr, 369 U.S. 186, 7 L Ed.2d
663 (1962), the Court concludes CLC and Hannah may bring
this action in their own right.

In addition, the Court is also of the opinion that CLC
and Hannah have standing to litigate the constitutional
rights of mentally retarded citizens who are potential
residents of the proposed group home. Limitations on a
litigant's assertion of jus tertii standing are not constitutionally
mandated, but instead stem from a salutory "rule of self
restraint." Craig v. Boren, 429 U.S. 190, 50 L Ed.2d 397
(1976). CLC and Hannah are virtually indistinguishable from

16

the vendors in Carey v. Population Services Int'l., 431 U.S.
678, 52 L.Ed.2d 675 (1977), Craig, supra, and Eisenstadt v.
Baird, 405 U.S. 438, 31 L Ed.2d 349 (1972).  On this authority
the Court concludes Hannah and CLC are proper litigants to
champion the constitutional rights of adult mentally retarded
citizens who are potential residents or "clients" of the
group home.  See also Aladdin's Castle, Inc. v. City of
Mesquite, 630 F.2d 1029, 1036 (5th Cir. 1980).

The Court reaches a different conclusion with regard to
the Johnson County Association for Retarded Citizens.  The
record is devoid of any sufficient injury, economic or
non-economic, to the Association which would justify its
inclusion into this litigation.  See Warth v. Seldin, 422
U.S. 490, 45 L.Ed.2d 343 (1975); Sierra Club v. Morton, 405
U.S. 727, 31 L.Ed.2d 636 (1972).  Further, there is no
evidence that the Defendants' conduct has in any way adversely
affected the associational ties of the association's members.
Id.  For these reasons then the Johnson County Associaton
for Retarded Citizens will be dismissed from this litigation.

Advocacy Inc., an independent state agency created
pursuant to 42 USC § 6012, also has standing to represent
adult mentally retarded citizens who are potential residents
of the group home.  See Goldstein v. Coughlin, 83 FRD 613
(W.D. N.Y. 1979); Naughton v. Bevilacqua, 458 F.Supp. 610,
617 (D.R.I. 1978).  But see Developmental Disabilities
Advocacy Center, Inc., 521 F.Supp. 365 (D.N.H. 1981).  This
is especially appropriate where, as is true in the instant
case, Hannah and CLC have shown that they are proper litigants

17

according to constitutional and prudential standing requirements.
Advocacy Inc., however, is not a proper litigant insofar as
it purports to represent the individual interests of Hannah
and CLC.

   2.  Equal Protection

   Plaintiffs assail the city's zoning ordinance, as
written and as applied, on grounds that it denies mentally
retarded citizens their rights to equal protection.  In
accordance with traditional equal protection analysis, the
Court first notes that the ordinance in question and the
denial of the special use permit do not impact upon any
fundamental right guaranteed to Plaintiffs by the United
States Constitition.  Hence, the Court focuses upon whether
the ordinance, as written and as applied, creates a suspect
classification.  There can be little doubt that Cleburne's
 zoning ordinance selectively discriminates against the
"insane or feeble minded."

   The traditional factors for the determination of a
suspect class are found in San Antonio I.S.D. v. Rodriguez,
411 U.S. 1, 36 L Ed.2d 16 (1973).  Although classification
according to mental retardation has never been examined by
the Supreme Court, see Schweicker v. Wilson, 450 U.S. 221,
67 L.Ed.2d 186 (1981), several lower courts have considered
similar issues and arrived at conflicting results.  For
example, some  Courts have rejected the contention that the
mentally retarded are a suspect class, Doe v. Colaulri, 454
F.Supp. 621, 632 (E.D. Pa. 1978), aff'd 592 F.2d 704 (3rd

Cir. 1979), <u>New York State Ass'n for Retarded Children v.</u>
<u>Rockefeller</u>, 357 F. Supp. 752, 762 (E.D. N.Y. 1973), while
others have stated that the mentally retarded constitute a
"quasi-suspect" class prompting a heightened standard of
review. <u>Sterling v. Harris</u>, 478 F.Supp. 1046, 1053 (N.D.
Ill. 1979), <u>rev'd on other grounds sub nom.</u>  <u>Schweiker v. Wilson</u>,
450 U.S. 221, 67 L.Ed.2d 186 (1981).  <u>Frederick v. Thomas</u>, 408 F.Supp.
823, 836 (E.D. Pa. 1976); <u>Fialkowski v. Schapp</u>, 405 F.Supp. 946,
958-59 (E.D. Pa. 1975) (<u>dictum</u>).  The Court is of the opinion
that mental retardation is not a suspect or quasi-suspect
class prompting strict or heightened judicial scrutiny.  In
support of its conclusion the Court adopts the reasoning  of
the Third Circuit Court of Appeals in <u>Doe v. Colautti</u>, 592
F.2d 704 (3rd Cir. 1979).  Accordingly, Cleburne's zoning
ordinance will be afforded a presumption of validity and
upheld if it can be shown to bear some rational relationship
to the city's legitimate purposes or interests.  <u>San Antonio</u>
<u>I.S.D. v. Rodriguez</u>, 411 U.S. 1, 40, 55, 36 L Ed 2d 16, 47,
56 (1973).

     Subjected to this limited standard of review, the Court
finds that the ordinance, both as written and applied,
passes constitutional muster.  Certainly the city has a
legitimate interest in the location of a group home intended
for the purpose of housing thirteen adult mentally retarded
citizens.  Cleburne does not absolutely bar such concerns in
its jurisdiction, but instead merely exercises authority
with regard to the location of such a home.  The location of
the group home raises many legitimate concerns with the city

19

and its residents.  Such concerns were voiced in the political
process leading to the denial of the special use permit.  In
particular, the Court focuses upon the legal responsibility
of CLC and its residents, as well as the safety and fears of
residents in the adjoining neighborhood.  Opponents of the
special use permit also viewed the number of residents and
the particular structure in which they were to be housed
with skepticism.  It should be noted that subsequent to the
denial of the permit, the State of Texas, through its Department
of Health Resources, has proposed and adopted Rule 326.35.03.005
which limits its certifiation of ICF-MRs to those which have
six beds per facility or less.  In sum, the Court is constrained
to conclude that the zoning ordinance as written and as
applied to Plaintiffs, is rationally related to legitimate
purposes and interests of the City of Cleburne.  It is not
arbitrary, capricious or irrational.

### 3. Due Process - Police Power

Plaintiffs contend that the City of Cleburne has exceeded
its legitimate police powers by virtue of the zoning ordinance,
as written and as applied.  In particular, Plaintiffs assert
the ordinance and the decision to deny a special use permit
bear neither a rational nor substantial relationship to the
public health, safety, morals, or general welfare.  See e.g.
Village of Euclid v. Ambler Realty Co., 272 U.S. 365, 395
71 L.Ed. 303 (1926); Couf v. DeBlaker, 652 F.2d 585, 588
(5th Cir. 1981); Wheeler v. City of Pleasant Grove, 644 F.2d
99, 100 (5th Cir. 1981).  The Supreme Court has recently
noted that the power of local governments to zone and control

20

land use is undoubted and that its proper exercise is an
essential aspect of achieving a satisfactory quality of life
in both urban and rural communities.  Schad v. Borough of
Mt. Ephram, 452 U.S. 61, 68 L.Ed.2d 671, 680 (1981).  At
this point it is appropriate to distinguish between the
interests asserted by Hannah and CLC in their own right as
opposed to the interests asserted in their representative
capacity.  Hannah and CLC have an economic property interest
in their own right.  In their representative capacity they
assert alleged liberty interests on behalf of mentally
retarded adults who are potential residents or clients of
the group home.  In Schad, supra, the Supreme Court stated
that where property interests are at stake, the ordinance
need only be  rationally related to legitimate concerns and
not deprive the owner of economically viable use of the
property.  452 U.S. at 68.  Where a protected liberty interest
is at stake, the ordinance must be narrowly drawn and further
a sufficiently substantial government interest.  Id.

The Cleburne ordinance, with respect to the individual
interests of Hannah and CLC suffers from no constitutional
infirmity.  As discussed in section 2 above, the ordinance
is rationally related to legitimate concerns of the city.
Further, it does not deprive the owners of economically
viable use of the property.  Accordingly, Cleburne's ordinance
is without constitutional infirmity with regard to the
property interests asserted by Hannah and CLC.

The exercise of the city's inherent police powers with
respect to the liberty interests of potential residents of

21

the group home requires a more lengthy discussion.  It is
important to bear in mind that all the City of Cleburne has
done is to reject a potential site for a group home.  As was
discussed earlier, the Court has rejected Plaintiffs' contentions
that mentally retarded citizens constitute a suspect class.
Plaintiffs, however, additionally contend that the ordinance
and the decision to deny the special use permit, impinge
upon freedoms of association and travel.  The Supreme Court
has rejected similar contentions in Village of Belle Terre
v. Boraas, 416 U.S.  1, 8-9, 39 L.Ed.2d 797, 803-04 (1974).
Cleburne has merely denied Plaintiffs the right to conduct
their business at a specific location in the City.  Other
locations are available and the Court can find no impingement
upon constitutionally guaranteed rights of association and
travel.  For these reasons, it appears that the "liberty
interest" test set forth in Schad, supra is inapplicable to
the facts of this case.  Under the limited standard of
review governing mere property interests, the Court has
already concluded the ordinance and denial of the special
use permit withstand scrutiny.  Further, were the court to
apply the heightened state of review enunciated in Schad,
the Court would likewise approve of the ordinance and denial
of the special use permit.  Cleburne's interest in selectively
locating homes for the mentally retarded is substantial--the
evidence indicates a concern for not only the rights of
adjoining landowners but also for the potential residents of
the home.  The ordinance is drawn as narrowly as possible to
accomodate these interests .

22

Finally, the Court notes that the facts of this case
bear little resemblance to those in Moore v. East Cleveland,
Ohio, 431 U.S. 494, 52 L.Ed.2d 531 (1977) and State of
Washington ex rel Seattle Title Trust Co. v. Roberge, 278
U.S. 116, 73 L.Ed. 210 (1928).  In Moore, the Court emphasized
the government's intrusion into the "extended family" living
arrangement and concluded that the ordinance in question did
little to further the interests claimed by the government.
There has been no similar showing in the case at bar.  In
Roberge, the Court concluded that a governmental entity may
not constitutionally delegate its entire zoning powers to
the owners of adjoining land.  Although the city council of
Cleburne was heavily influenced by the opinions of adjoining
landowners, it is abundantly clear that the city did not
completely delegate its police powers.  In sum, the Court
concludes that the city's conduct was a proper and permissible
exercise of its police powers.

    4.  Due Process - Vagueness

Plaintiffs also assail the Cleburne zoning ordinance on
grounds that it is impermissibly vague.  Nothing that section
27 of the ordinance provides criminal penalties for its
violation, Plaintiffs focus the Court's attention to the
variance found in the two pertinent sections, §§ 8, 16, with
regard to "home" and "hospital".  Plaintiffs additionally
offer the Court various hypothetical situations which could
result in ambiguity under the city's zoning laws as a whole.

At the outset of its analysis, the court notes that on

23

the facts of this case the ordinance does not " 'abut upon
sensitive areas of basic First Amendment freedoms.'"  Grayned
v. City of Rockford, 408 U.S. 104, 109, 33 L.Ed.2d 222,
228 (1972),  [quoting Smith v. Goguen, 415 U.S. 556, 572-73,
39 L.Ed.2d 605 (1974)].  Accordingly the law does not demand
the greater degree of specificity reserved for the protection
of First Amendment freedom.  Parker v. Levy, 417 U.S. 733,
41 L.Ed.2d 439 (1974).  In fact, the ordinance in question
is more appropriately characterized as an economic regulatory
statute.  The standard for its validity is set forth in
Parker, supra:

> The strong presumptive validity that attaches to
> an Act of Congress has led this Court to hold many
> times that statutes are not automatically invalidated
> as vague simply because difficulty is found in
> determining whether certain marginal offenses fall
> within their language.  Indeed, we have consistently
> sought an interpretation which supports the consti-
> tutionality of legislation.
>
> Void for vagueness simply means that criminal
> responsibility should not attach where one could
> not reasonably understand that his contemplated
> conduct is proscribed.  In determining the
> sufficiency of the notice a statute must of
> necessity be examined in the light of the conduct
> with which a defendant is charged.

417 U.S. 733, 757, 41 L.Ed.2d 439, 458 (1974) [quoting United States
v. Nat'l. Dairy Corp., 372 U.S. 29, 32-33, 9 L.Ed.2d 561
(1963)].  Under this limited standard of review the Court
finds that the ordinance withstands constitutional assault.
The Court has little to no difficulty in construing sections
8 and 16 to include the proposed group home despite the
minor variance of terms ("home v. "hospital")  therein.  A
person of ordinary intelligence can reasonably understand

24

that sections 8 and 16 require a special use permit for the operation of a for-profit group home for mentally retarded adults. Any ambiguity is minute.

On the facts of this case, it is beyond peradventure that Plaintiffs received clear and sufficient notice of the city's prohibitions. Accordingly, there is some doubt as to whether Plaintiffs may raise the vagueness claims, especially in the absence of an impingement upon First Amendment freedoms. See Parker v. Levy, 417 U.S. 733, 756, 41 L.Ed.2d 439, 458 (1974) (one to whose conduct a statute clearly applies may not successfully challenge it for vagueness). In any event, it is amply clear that the Court need not engage in speculation concerning hypothetical fact situations and their disposition under the ordinance. In short, the Court concludes that sections 8 and 16 of the ordinance are not impermissibly vague. The Court is reminded of the Supreme Court's opinion in Grayned, supra where it was stated that "condemned to the use of words, we can never expect mathematical certainty from our language." 408 U.S. at 110, 33 L.Ed 2d at 228-29.

5.  Freedom of Association and Right to Travel.

By these claims Plaintiffs would have the Court read much more into Defendants' conduct than the record reflects. Cleburne is merely exercising its inherent policy powers to approve or disapprove of the specific location of Plaintiffs' business endeavor. The city does not bar group homes for mentally retarded citizens from its jurisdiction and neither does it inhibit their rights to associate. In sum, mentally retarded citizens are free to live and associate in Cleburne,

25

Texas. The city has merely prohibited the establishment of a for-profit group home for 13 mentally retarded citizens at one specific location. As has been discussed above, the city has a significant and substantial interest in the ulitmate location of the home. PLaintiffs' contentions are simply without merit.

   D. __Conclusions__

   The Court finds no statutory or constitutional infirmities in the Cleburne zoning ordinance, as written and as applied. Accordingly, judgment for Defendants on all claims will enter.

   Signed and entered this 7th day of October.
1982.

UNITED STATES DISTRICT JUDGE

1.  31 U.S.C. § 1242(a)(1):

No person in the United States shall, on the
ground of race, color, national origin, or sex, be excluded
from participation in, be denied the benefits of, or be
subjected to discrimination under any program or activity
of a state government or unit of local government,
which government or unit receives funds made available
under subchapter I of this chapter.  Any prohibition
against discrimination on the basis of age under the Age
Discrimination Act of 1975 or with respect to an other-
wise qualified handicapped individual as provided in
section 794 shall also apply to any such program or
activity.  Any prohibition against discrimination on the
basis of religion, or any exemption from such prohibition,
as provided in the Civil Rights Act of 1964 or
Title VIII of the Act of April 11, 1968, hereafter referred
to as Civil Rights Act of 1968, shall also apply to any
such program or activity.


2.  29 U.S.C. § 749:

No otherwise qualified handicapped individual in the
United States, as defined in section 706(7) of this title,
shall, solely by reason of his handicap, be excluded from
the participation in, be denied the benefits of, or be
subjected to discrimination under any program or activity
receiving Federal financial assistance or under any program
or activity conducted by any Executive agency or by the
United States Postal Service.  The head of each such agency
shall promulgate such regulations as may be necessary to
carry out the amendments to this section made by the Rehabilitation,
Comprehensive Services, and Developmental Disabilities Act
of 1978.  Copies of any proposed regulation shall be submitted
to appropriate authorizing committees of the Congress, and
such regulation may take effect no earlier than the thirtieth
day after the date on which such regulation is so submitted
to such committees.

i

3.  31 U.S.C. § 1242(a)(2)(A):

The provisions of paragraph (1) of this subsection shall not apply where any State government or unit of local government demonstrates, by clear and convincing evidence, that the program or activity with respect to which the allegation of discrimination has been made is not funded in whole or in part with funds made available under subchapter I of this chapter.

ii